**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



_____X

MALKA KRAUSZ, Individually and on Behalf :     **'08 CIV 8519**
of all others similarly situated, :

                        Plaintiff, :     Civil Action No.:

      vs. :     Removed from:

FEDERAL NAT'L MORTGAGE ASSOC. A/K/A :
FANNIE MAE, DANIEL H. MUDD, STEPHEN :     Supreme Court, State of New
M. SWAD, LEHMAN BROS. INC., MERRILL :     Index No. 112---
LYNCH, PIERCE, FENNER & SMITH :
INC., GOLDMAN, SACHS & CO., and J.P. :
MORGAN SECURITIES INC., :

                     Defendants. :

_____X

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1441 and 1446, defendants Merrill Lynch, Pierce, Fenner &

Smith Incorporated ("Merrill Lynch"), Goldman, Sachs & Co. ("Goldman Sachs"), J.P. Morgan

Securities Inc. ("J.P. Morgan"), Lehman Brothers Inc. ("Lehman"), Federal National Mortgage

Association ("Fannie Mae") and Daniel H. Mudd (collectively, "Defendants")[1] hereby remove

the above-captioned civil action, and all claims and causes of action therein, from the Supreme

Court of the State of New York, County of New York to the United States District Court for the

---

[1] As counsel for Lehman has previously notified the Supreme Court of the State of New
York in which this action was filed, any new or further action against Lehman is stayed
pursuant to section 362 of the Bankruptcy Code as of September 19, 2008. _See_ Notice of
Liquidation Proceeding and Automatic Stay, filed on September 24, 2008, in the
Supreme Court of the State of New York (attached as Exhibit B). Lehman nevertheless
consents to removal of this action.

Defendant Stephen M. Swad has consented to the removal of this action to the United
States District Court for the Southern District of New York. Defendant Swad's signed
written form of consent is attached hereto as Exhibit C.

Southern District of New York.[2]  This action is removable pursuant to 15 U.S.C. §§ 77v(a),

77p(c), and, alternatively, pursuant to 28 U.S.C. § 1332, as amended by the Class Action

Fairness Act of 2005, and 28 U.S.C. § 1453, and pursuant to 12 U.S.C. § 1723a.

As grounds for removal, Defendants state as follows:

1.    On or about September 11, 2008, plaintiff Malka Krausz filed this putative class

action in the Supreme Court of the State of New York, County of New York, Index No.

112450/2008, on behalf of herself and all others who purchased Series-S Fixed-to-Floating Rate

Non-Cumulative Preferred Stock ("Series-S Preferred Stock") issued by defendant Fannie Mae

pursuant and/or traceable to Fannie Mae's public offering of the Series-S Preferred Stock

completed on December 11, 2007.  (A copy of the Summons and Complaint is attached hereto as

Exhibit A).

2.    The Complaint alleges, among other things, that certain offering materials issued

in connection with the public offering contained misstatements and omissions in violation of

Sections 12(a)(2) and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77l(a)(2), 77o (the

"Securities Act").  *See* Compl. ¶¶ 41-57.  The Complaint also asserts state law claims for

common law fraud and negligent misrepresentation.  *See* Compl. ¶¶ 58-68.

3.    This Notice of Removal is being filed in the United States District Court for the

Southern District of New York within thirty days of the filing of the Summons and Complaint

and is thus timely filed under 28 U.S.C. § 1446(a) and (b).  J.P. Morgan, Merrill Lynch, and

Goldman Sachs were served with the Summons and Complaint on September 15, September 16,

and September 19, 2008, respectively.  Fannie Mae was served with the Summons and

---

[2]    By removing this matter, Defendants do not waive, and expressly preserve, any and all
defenses that they may have including, but not limited to, lack of personal jurisdiction
and service of process.

Complaint on September 18, 2008. By agreement between counsel for Plaintiff and counsel for

Defendant Mudd, the Summons and Complaint have yet to be served on Defendant Mudd.

<u>**Securities Litigation Uniform Standards Act of 1998 ("SLUSA")**</u>

4.      This action is within the original jurisdiction of this Court under 28 U.S.C. § 1331

because it includes claims purporting to arise under the laws of the United States, namely

Sections 12(a)(2) and 15 of the Securities Act. Because this is a civil action over which this

Court has original jurisdiction under 28 U.S.C. § 1331, it is removable under 28 U.S.C. §

1441(a). Pursuant to 28 U.S.C. § 1441(a): "[e]xcept as otherwise expressly provided by Act of

Congress, any civil action brought in a State court of which the district courts of the United

States have original jurisdiction, may be removed . . . to the district court of the United States for

the district and division embracing the place where such action is pending."

5.      This court also has jurisdiction, and this action is removable to this court, under

Section 16(c) of the Securities Act, as amended by SLUSA, which provides that "[a]ny covered

class action brought in any State court involving a covered security, as set forth in subsection (b),

shall be removable to the Federal district court for the district in which the action is pending, and

shall be subject to subsection (b)." 15 U.S.C. §77p(c).[3] Section 22(a) of the Securities Act states

that "*[e]xcept as provided in [Section 16(c)],* no case arising under this subchapter and brought

in any State court of competent jurisdiction shall be removed to any court of the United States."

15 U.S.C. § 77v(a) (emphasis added). Section 22(a) of the Securities Act therefore creates an

---

[3]     Subsection (b) of Section 16 provides: "[n]o covered class action based upon the
statutory or common law of any State or subdivision thereof may be maintained in any
State or Federal court by any private party alleging (1) an untrue statement or omission of
a material fact in connection with the purchase or sale of a covered security; or (2) that
the defendant used or employed any manipulative or deceptive device or contrivance in
connection with the purchase or sale of a covered security." 15 U.S.C. § 77p(b).

exemption (through Section 16(c)) to its non-removal provision, and expressly allows the

removal of certain "covered class actions" arising under the Securities Act.

      6.      The term "covered class action" includes:

> [a]ny single law suit in which . . . one or more named parties seek
> to recover damages on a representative basis on behalf of
> themselves and other unnamed parties similarly situated, and
> questions of law or fact common to those persons or members of
> the prospective class predominate over any questions affecting
> only individual persons or members.

15 U.S.C. § 77p(f)(2)(A)(i)(II).  "Covered security" is defined to include shares listed, or

authorized for listing, on the New York Stock Exchange ("NYSE"), or "a security of the same

issuer that is equal in seniority or that is a senior security to a security" that is listed, or

authorized for listing, on the NYSE.  15 U.S.C. §§ 77p(f)(3), 77r(b)(1)(A), (C).

      7.      In this case, Plaintiff is a named party seeking to recover damages on a

representative basis on behalf of herself and others similarly situated, and the Complaint alleges

that questions of law or fact common to the proposed class predominate over individual

questions.  *See* Compl. ¶¶ 20-21.  Thus, this case is a "covered class action."

      8.      The Fannie Mae securities at issue are listed on the NYSE (*see* Compl. ¶ 8), were

so listed or authorized for listing during the relevant time period, and/or are "equal in seniority or

[are] senior securit[ies] to" Fannie Mae securities that are and were listed on the NYSE during

the relevant time period, 15 U.S.C. § 77r(b)(1)(C).  Accordingly, this is a "covered class action"

involving a "covered security."

      9.      Under these circumstances, this action is removable to this Court under 15 U.S.C.

§§ 77v(a), 77p(c) and 28 U.S.C. § 1441(a).  *See Lander v. Hartford Life & Annuity Ins. Co.*, 251

F.3d 101 (2d Cir. 2001) (holding that class action asserting state and common law claims for,

*inter alia*, fraud and negligent misrepresentation, in connection with purchase of "covered

securities," was removable under SLUSA); *Rubin v. Pixelplus Co.*, No. 06-CV-2964 (ERK), 2007 WL 778485 (E.D.N.Y. Mar. 13, 2007) (holding that class action claims brought under the Securities Act are removable under SLUSA); *Pinto v. Vonage Holdings Corp.*, Civil Action No. 07-0062 (FLW), 2007 WL 1381746 (D.N.J. May 7, 2007) (same); *Rovner v. Vonage Holdings Corp.*, Civil Action No. 07-178 (FLW), 2007 WL 446658 (D.N.J. Feb. 7, 2007) (same); *Brody v. Homestore, Inc.*, 240 F. Supp. 2d 1122 (C.D. Cal. 2003) (same); *Alkow v. TXU Corp.*, Nos. 3:02-CV-2738-K, 3:02-CV-2739-K, 2003 WL 21056750 (N.D. Tex. May 8, 2003) (same); *see also California Public Employees' Retirement System v. WorldCom, Inc.*, 368 F.3d 86, 97 (2d Cir. 2004) ("Section 16(c) of the [Securities] Act excepts 'class action[s] brought in state court' from the scope of the nonremoval provision and provides that those class actions '*shall* be removable to the Federal district court for the district in which the action is pending.'") (emphasis in original).

### Class Action Fairness Act of 2005 ("CAFA")

10.     In the event that it is determined that this action is not removable under SLUSA, this Court has jurisdiction under CAFA, and the action may be removed, under 28 U.S.C. §§ 1332(d)(2) and 1453, pursuant to which a putative "class action" commenced after February 18, 2005 may be removed to the appropriate United States District Court if: (a) the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs; (b) any member of the putative class is a citizen of a state different from any defendant; and (c) no specified exceptions apply. 28 U.S.C. §§ 1332(d), 1453; *see also N.J. Carpenters Vacation Fund v. HarborView Mortgage Loan Trust 2006-4*, No. 08 Civ. 5093 (HB), 2008 WL 4369840, at *2, *6 (S.D.N.Y. Sept. 24, 2008) (noting that "by its clear language, CAFA creates original jurisdiction for and removability of *all* class actions that meet the minimal requirements and do

not fall under one of the limited exceptions" and holding that "CAFA overrides the Securities

Act's anti-removal provision") (emphasis in original).

11.    CAFA applies here because the state court action was commenced on or about

September 11, 2008, *i.e.*, after the effective date of CAFA.  28 U.S.C. §§ 1332, 1453.

12.    The state court action is a "class action" within the meaning of CAFA because

Plaintiff seeks to represent a class of persons in a "civil action filed under" Article 9 of the New

York Civil Practice Law and Rules, *i.e.*, a "State statute or rule of judicial procedure authorizing

an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. §§

1332(d)(1)(B), 1453(a).

13.    The state court action satisfies CAFA's amount-in-controversy requirement.

Under 28 U.S.C. § 1332(d)(6), the amount in controversy in a putative class action is determined

by aggregating the amount at issue in the claims of all members of the putative class.  Here, the

Complaint alleges that Defendants made false and misleading statements in connection with the

offering of at least 280 million shares of Series-S Preferred Stock, and alleges that the value of

these shares has declined from $25.00 per share to $3.00 per share.  *See* Compl. ¶¶ 1, 21(a), and

40.  While Defendants deny that Plaintiff or any putative class member is entitled to recover any

amount, or to any other relief, these allegations suffice to show that the aggregate amount in

controversy is more than $5,000,000, exclusive of interest and costs.  28 U.S.C. § 1332(d)(2).

14.    The state court action also satisfies CAFA's diversity-of-citizenship requirement.

To establish diversity jurisdiction under CAFA, it is sufficient that any one member of the

putative class is a citizen of a state different from any one defendant, in contrast to the complete

diversity requirement of typical diversity jurisdiction.  28 U.S.C. § 1332(d)(2)(A).  Defendants'

places of incorporation or formation and principal places of business are as follows:  Defendant

Merrill Lynch is a Delaware corporation with its principal place of business in New York. Defendant Goldman Sachs is a New York limited partnership with its principal place of business in New York. Defendant J.P. Morgan is a Delaware corporation with its principal place of business in New York. Defendant Fannie Mae is a federally chartered corporation with its principal place of business in Washington, D.C.[4] Defendant Daniel Mudd is a citizen and resident of the District of Columbia. Upon information and belief, defendant Stephen Swad is a citizen and resident of Maryland. The Complaint further alleges that the number of members of the putative class "is believed to be in the thousands" (Compl. ¶ 21)[5]; there is therefore a "reasonable probability" that at least one member of the putative class will have a different citizenship from one of the Defendants, and thus diversity jurisdiction exists under CAFA.[6] *See Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 59 (2d Cir. 2006); *McMorris v. TJX Cos.,* 493 F. Supp. 2d 158 (D. Mass. 2007); *Larsen v. Pioneer Hi-Bred Int'l Inc.,* No. 4:06-cv-0077-JAJ, 2007 WL 3341698 (S.D. Iowa Nov. 9, 2007).

**Removal Is Proper Pursuant to Fannie Mae's Charter**

15.    Fannie Mae's Charter is codified, by Federal Statute, in the Federal National Mortgage Association Charter Act, 12 U.S.C. § 1716, *et seq.* Section 309(a) of the charter provides that Fannie Mae "shall have the power . . . to sue and *to be sued,* and to complain and *to*

---

[4]    For purposes of jurisdiction in civil actions, Fannie Mae is statutorily deemed to be a District of Columbia corporation. *See* 12 U.S.C. § 1717(a)(2)(B).

[5]    Plaintiff has not identified her state of citizenship and residence, and has not provided her address; Defendants' good faith efforts to identify such information have been inconclusive.

[6]    Indeed, given that the Defendants themselves are diverse from each other, it necessarily follows that at least one putative class member will be diverse from one Defendant.

*defend, in any court* of competent jurisdiction, State *or Federal*." 12 U.S.C. § 1723a(a)

(emphasis supplied).

16.     The Supreme Court has held that "a congressional charter's 'sue and be sued'

provision may be read to confer federal court jurisdiction" where, as here, "it specifically

mentions the federal courts." *Am. Nat'l Red Cross v. S.G.*, 505 U.S. 247, 255 (1992).  For this

reason, the D.C. Circuit specifically held this year that "Fannie Mae's sue-and-be-sued clause

confers federal subject-matter jurisdiction." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits*

*Trust Fund v. Raines*, 534 F.3d 779, 784-88 (D.C. Cir. 2008);[7] *see also C.C. Port, Ltd. v. Davis-*

*Penn Mortgage Co.*, 891 F. Supp. 371, 372 (S.D. Tex. 1994) (stating that the charter provides

federal subject matter jurisdiction).  Removal of a case in which Fannie Mae is a defendant is

therefore appropriate under 28 U.S.C. § 1441.  *See Grun v. Countrywide Home Loans, Inc.*, No.

Civ.A.SA-03-CA-0141, 2004 WL 1509088, at *2 (W.D. Tex. July 1, 2004) (holding that Fannie

Mae's charter authorizes removal); *Peoples Mortgage Co. v. Fed. Nat'l Mortgage Ass'n*, 856 F.

Supp. 910, 917 (E.D. Pa. 1994) (same).

17.     For this reason, Fannie Mae's Federal Charter provides an additional, and

independent, basis for removal.

### Other Procedural Requirements

18.     In accordance with 28 U.S.C. § 1446(a), Exhibit A and Exhibit B include file-

stamped copies of all process, pleadings and orders served upon Defendants in the state court

action, namely the Summons and Complaint and the Notice of Liquidation Proceeding and

Automatic Stay.

---

[7]     On September 5, 2008, appellants Pirelli Armstrong Tire Corporation and Wayne County
Employees' Retirement System petitioned for rehearing en banc of the *Pirelli* decision.
On September 29, 2008, the *Pirelli* court issued an order holding the case in abeyance
pending further order of the court.

19.     Defendants will promptly serve a copy of the Notice of Removal on Plaintiff's counsel and file with the Clerk of the Supreme Court of the State of New York, County of New York, a Notice of Filing of Notice of Removal pursuant to 28 U.S.C. § 1446(d).

20.     This Notice of Removal is signed pursuant to Fed. R. Civ. P. 11.  *See* 28 U.S.C. § 1446(a).

WHEREFORE, this action should proceed in the United States District Court for

the Southern District of New York, as an action properly removed thereto.

Dated: New York, New York
       October 6, 2008                     Respectfully submitted,

                                           SIMPSON THACHER & BARTLETT LLP


                                           By: _____

                                           Paul C. Curnin
                                           pcurnin@stblaw.com
                                           Michael J. Chepiga
                                           mchepiga@stblaw.com
                                           George Wang
                                           gwang@stblaw.com
                                           Simpson Thacher & Bartlett LLP
                                           425 Lexington Avenue
                                           New York, N.Y. 10017-3954
                                           Telephone: (212) 455-2000
                                           Facsimile:  (212) 455-2502
                                           *Attorneys for Defendants Merrill Lynch,*
                                           *Pierce, Fenner & Smith Incorporated,*
                                           *Goldman, Sachs & Co., J.P. Morgan Securities*
                                           *Inc., and Lehman Brothers Inc.*

Dated: New York, New York
      October 6, 2008

Respectfully submitted,

LATHAM & WATKINS LLP

By: _____

James E. Brandt
james.brandt@lw.com
Jeff G. Hammel
jeff.hammel@lw.com
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
*Attorneys for Defendant Federal National*
*Mortgage Association*

Dated: New York, New York
          October 6, 2008

Respectfully submitted,

PAUL, HASTINGS, JANOFSKY & WALKER
LLP

By: _____

David Fleischer
davidfleischer@paulhastings.com
Paul, Hastings, Janofsky & Walker LLP
Park Avenue Tower
75 E. 55th Street
First Floor
New York, NY 10022
Telephone: (212) 318-6000
Facsimile: (212) 319-4090

James D. Wareham
jameswareham@paulhastings.com
James E. Anklam
jamesanklam@paulhastings.com
Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W.
Washington, DC 20005
Telephone: (202) 551-1700
Facsimile: (202) 551-1705

*Attorneys for Defendant Daniel H. Mudd*

To:

Stull, Stull & Brody
Jules Brody
Aaron Brody
6 East 45th Street
New York, New York 10017
Telephone: (212) 687-7230

Koven & Krausz
Mordchai Krausz
350 5th Avenue
New York, New York 10118
Telephone: (212) 736-7432

*Attorneys for Plaintiff*

Stephen M. Swad
8521 Country Club Drive
Bethesda, MD 20815

# EXHIBIT

# A

Supreme Court of the State of New York
County of   NEW YORK

| | |
|---|---|
| MALKA KRAUSZ, Individually and on Behalf of All Others Similarly Situated, | Index No. Date purchased **08 112450** |
| Plaintiff, | Plaintiff(s) designate(s) ›  New York County as the place of trial. |
| v. | The basis of the venue is Defendants conduct business in New York County. |
| FEDERAL NAT'L MORTGAGE ASSOC. A/K/A FANNIE MAE, DANIEL H. MUDD, STEPHEN M. SWAD, LEHMAN BROS. INC., MERRILL LYNCH PIERCE FENNER & SMITH INC., GOLDMAN SACHS & CO., and J.P. MORGAN SECURITIES INC., | **Summons** |
| Defendants. | Plaintiff(s) reside(s) at c/o Stull, Stull & Brody 6 E. 45th St., Ste. 500 County of New York, County of New York, New York 10017 |

To the above named Defendant(s)

**You are hereby summoned** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within   20   days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgement will be taken against you by default for the relief demanded in the complaint.

Dated,  September 11, 2008

Defendant's address:
Federal National Mortgage Association
3900 Wisconsin Ave., NW
Washington, DC 20016

Attorney(s) for Plaintiff
STULL, STULL & BRODY
Office and Post Office Address
6 E. 45th St., Suite 500
New York, NY 10017

**Notice:** The nature of this action is

Class action pursuant to ss. 12(a)(2) and 15 of SEC act (15 USC ss. 77l and 77o; alleging dissemination of false and misleading financial information to the investing public.

The relief sought is

Upon your failure to appear, judgment will be taken against you by default for the sum of $ with interest from                         19        and the costs of this action.

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK, COUNTY OF _____   SS:   The undersigned, being duly sworn, deposes and says; deponent is not a party herein, is over 18 years of age and resides at _____

That on _____ at _____ M., at _____ deponent served the within summons, _____ on _____ defendant,

**INDIVIDUAL 1.** ☐ by delivering a true copy *of each* to said defendant personally; deponent knew the person so served to be the person described as said defendant therein.

**CORPORATION 2.** ☐ a _____ corporation, by delivering thereat a true copy *of each* to _____ personally, deponent knew said corporation so served to be the corporation described in said summons as said defendant and knew said individual to be _____ thereof.

**SUITABLE AGE PERSON 3.** ☐ by delivering thereat a true copy *of each* to _____ a person of suitable age and discretion. Said premises is defendant's—actual place of business—dwelling place—usual place of abode—within the state.

**AFFIXING TO DOOR, ETC. 4.** ☐ by affixing a true copy *of each* to the door of said premises, which is defendant's—actual place of business—dwelling place—usual place of abode—within the state. Deponent was unable, with due diligence to find defendant or a person of suitable age and discretion thereat, having called there

**MAILING TO RESIDENCE USE WITH 3 OR 4 5A.** ☐ Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a postpaid envelope properly addressed to defendant at defendant's last known residence, at _____ and deposited said envelope in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State.

**MAILING TO BUSINESS USE WITH 3 OR 4 5B.** ☐ Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a first class postpaid envelope properly addressed to defendant at defendant's actual place of business, at _____ in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State. The envelope bore the legend "Personal and Confidential" and did not indicate on the outside thereof, by return address or otherwise, that the communication was from an attorney or concerned an action against the defendant.

**DESCRIPTION USE WITH 1, 2, OR 3** ☐

| | | | | | |
|---|---|---|---|---|---|
| ☐ Male | ☐ White Skin | ☐ Black Hair | ☐ White Hair | ☐ 14-20 Yrs. | ☐ Under 5' | ☐ Under 100 Lbs. |
| ☐ Female | ☐ Black Skin | ☐ Brown Hair | ☐ Balding | ☐ 21-35 Yrs. | ☐ 5'0"-5'3" | ☐ 100-130 Lbs. |
| | ☐ Yellow Skin | ☐ Blonde Hair | ☐ Mustache | ☐ 36-50 Yrs. | ☐ 5'4"-5'8" | ☐ 131-160 Lbs. |
| | ☐ Brown Skin | ☐ Gray Hair | ☐ Beard | ☑ 51-65 Yrs. | ☑ 5'9"-6'0" | ☐ 161-200 Lbs. |
| | ☐ Red Skin | ☐ Red Hair | ☐ Glasses | ☐ Over 65 Yrs. | ☐ Over 6' | ☐ Over 200 Lbs. |

Other identifying features: _____

*Sworn to before me on* _____

Print name beneath signature. ...........................................................

*LICENSE NO.* ...........................................................

Plaintiff(s)

against

Defendant(s)

**Summons with Notice**
ACTION NOT BASED UPON A CONSUMER CREDIT TRANSACTION

Attorney(s) for Plaintiff(s)

Office, Post Office Address and Tel. No.

...e Court of the State of New York
...of
No.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

MALKA KRAUSZ, Individually And On Behalf
of All Others Similarly Situated,

                Plaintiff,

      vs.

FEDERAL NATIONAL MORTGAGE
ASSOCIATION A.K.A. FANNIE MAE, DANIEL
H. MUDD, STEPHEN M. SWAD, LEHMAN
BROTHERS INC., MERRILL, LYNCH, PIERCE,
FENNER & SMITH INCORPORATED,
GOLDMAN, SACHS & CO. and J.P. MORGAN
SECURITIES INC.,

           Defendants.

Civil Action No. _____  08112450

**CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAWS, COMMON LAW
FRAUD AND NEGLIGENT
MISREPRESENTATION**

**JURY TRIAL DEMAND**

FILED
SEP 11 2008
COUNTY CLERK'S OFFICE
NEW YORK

Plaintiff Malka Krausz, for her class action complaint based upon the investigation

undertaken by her counsel, except as to her own acts and transactions, alleges as follows:

## NATURE OF THE ACTION

1.     Plaintiff brings this action as a class action under CPLR Article 9 on behalf of

herself and a class of persons who purchased Series-S Fixed-to-Floating Rate Non-Cumulative

Preferred Stock (CUSIP 313586752) ("Series-S Preferred Stock), issued by defendant Federal

National Mortgage Association ("Fannie Mae" or the "Company"), pursuant and/or traceable to

the Company's public offering of the Series-S Preferred Stock completed on December 11, 2007

(the "Offering").

2.      Plaintiff alleges, among other things, that the December 6, 2007 Offering Circular
(the "Offering Circular") used by the defendants to publicly sell the Series-S Preferred Stock to
members of the Class, as defined herein, was materially false and misleading because it failed to
disclose, among other things, the severity and breadth of losses the Company had incurred due to
the purchase or guarantee of high risk mortgages that rendered Fannie Mae's true financial
condition and prospects so bleak that the Company's ability to continue as a going concern was
threatened.

3.      Beginning in or before 2005, and on the heels of a massive restatement of its
earnings, Fannie Mae commenced a speculative strategy which bet the Company's future on the
premise that the U.S. real estate market bubble would continue to expand indefinitely.  To boost
near term profits and to report growth in its single family mortgage guaranty business and
retained portfolio, Fannie Mae began guaranteeing and/or purchasing high risk sub prime
mortgages on a massive scale.  Some of those mortgages came with low initial teaser interest
rates that quickly escalated over time, some came with the homeowner having little to no equity
in the home at the time of purchase, and some were underwritten with little to no documentation
to demonstrate the home purchaser's ability to make mortgage payments as they came due.  In
many cases, the mortgages Fannie Mae purchased or guaranteed made it attractive for people to
buy homes they could not afford.

4.      When the U.S. real estate bubble burst in early to mid-2007, Fannie Mae's
speculative strategy proved disastrous.  By the fall of 2007 Fannie Mae desperately needed to
raise billions of dollars of new equity capital.  Thus, Fannie Mae and the Individual Defendants
commenced a scheme to conceal from the public the dire consequences of Fannie Mae's
speculative strategy to delay the recognition of losses and the reporting of capital shortfalls so

that it could sell the Series-S Preferred Stock at artificially inflated prices to unknowing investors

such as the plaintiff herein and the other members of the Class. Defendants Lehman Brothers

Inc. ("Lehman"), Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), Goldman,

Sachs & Co. ("Goldman") and J.P. Morgan Securities Inc. ("J.P. Morgan"), knowingly or

recklessly participated in the scheme to, among other things, reap millions of dollars in

underwriting and advisory fees related to the Offering.

5.      Within weeks after completing the Offering on December 11, 2007, Fannie Mae's

true financial condition and prospects began to be revealed to the market. The disclosure of such

information caused the market price of Fannie Mae Series-S Preferred Stock to plummet from

the offering price of $25 per share to less than $3 per share. The market price of the Series-S

Preferred Stock is not expected to recover due to intervention and nationalization of Fannie Mae

by the federal government.

6.      The plaintiff, on behalf of herself and all those similarly situated, brings this

action to recover the damages caused by the defendants' violations of Sections 12(a)(2) and 15

of the Securities Act of 1933 (the "Securities Act"), common law fraud and negligent

misrepresentation.

## JURISIDICTION AND VENUE

7.      The claims asserted herein arise under and pursuant to Sections 12(a)(2) and 15 of

the Securities Act [15 U.S.C. §§ 77l and 77o], and common law fraud and negligent

misrepresentation.

8.      This Court has jurisdiction over this action and each defendant named herein

because many of the alleged wrongful acts occurred, at least in part, in New York County.

Fannie Mae regularly conducts business in New York County. Fannie Mae's common stock and

Series-S Preferred Stock are traded on the New York Stock Exchange ("NYSE") under symbols

FNM and FNM-PS. Each of the underwriter defendants maintains its headquarters in New York County. Each of the defendants has sufficient minimum contacts with New York so as to render the exercise of jurisdiction by the courts of this State permissible under traditional notions of fair play and substantial justice.

9.    Venue is proper in this Court because Fannie Mae conducts substantial business in New York County and several of the defendants either reside in or maintain their principal executive offices in New York County. Further, a substantial portion of the acts, transactions and wrongs complained of herein, including defendants' participation in the wrongful acts detailed herein, occurred in New York County. The defendants each have received substantial compensation for doing business in New York County and engaged in numerous activities pertaining to the claims herein that had an effect in New York County.

### PARTIES

10.    Plaintiff Malka Krausz purchased Fannie Mae Series-S Preferred Stock pursuant and/or traceable to the Offering, and was damaged thereby.

11.    Defendant Fannie Mae is a federally chartered and stockholder-owned corporation organized and existing under the Federal National Mortgage Association Charter Act (the "Charter Act"). The Company was established in 1938 as a United States government agency to provide supplemental liquidity to the mortgage market and was transformed into a stockholder-owned and privately managed corporation by legislation enacted in 1968. The Company's principal executive offices are located at 3900 Wisconsin Avenue, NW, Washington, D.C.

12.    Defendant Daniel H. Mudd ("Mudd") was, at all relevant times, Chief Executive Officer, President, Director and Member of the Executive Committee of Fannie Mae. On

4

September 8, 2008, Mudd was terminated in connection with the federal government's intervention and nationalization of the Company.

13.    Defendant Stephen M. Swad ("Swad") was, at all relevant times, Chief Financial Officer of Fannie Mae.

14.    Defendants Mudd and Swad are collectively referred to herein as the "Individual Defendants." By reason of their management positions and their ability to make public statements in the name of Fannie Mae, the Individual Defendants were and are controlling persons, and had the power and influence to cause (and did cause) Fannie Mae to engage in the improper conduct complained of herein.

15.    Defendant Lehman Brothers Inc. ("Lehman") maintains its principal executive offices at 745 Seventh Avenue, New York, New York 10019, and was a joint lead underwriter and joint book-running manager of the Offering. Under the terms set forth in the underwriting agreement by and among Fannie Mae and the Underwriter Defendants (as defined herein below) (the "Underwriting Agreement"), Lehman received more than $25,000,000 in fees for underwriting 100,800,000 shares of the Series-S Preferred Stock. Lehman was also engaged by Fannie Mae to provide certain advisory services in connection with the Offering. In addition to the $25,000,000 underwriting fees, Lehman also received fees from Fannie Mae for advisory services related to the Offering.

16.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") maintains its principal executive offices and world headquarters at 4 World Financial Center, 250 Vesey Street, New York, New York 10080, and was a joint lead underwriter and a joint book-running manager of the Offering. Under the terms of the Underwriting Agreement, Merrill

Lynch received more than $25,000,000 in fees for underwriting 100,800,000 shares of Series-S Preferred Stock.

17.    Defendant Goldman, Sachs & Co. ("Goldman"), maintains its principal executive offices in this County at 85 Broad Street, New York, New York 10004, and was the senior co-manager of the Offering.  Under the terms of the Underwriting Agreement, Goldman received more than $5,000,000 in fees for underwriting 22,400,000 shares of Series-S Preferred Stock.

18.    Defendant J.P. Morgan Securities Inc. ("J.P. Morgan") maintains its principal executive offices in this County at 270 Park Avenue, New York, New York 10017, and was a senior co-manager of the Offering.  Under the terms of the Underwriting Agreement, J.P. Morgan received more than $5,000,000 in fees for underwriting 22,400,000 shares of Series-S Preferred Stock.

19.    Defendants Lehman, Merrill Lynch, Goldman and J.P. Morgan are collectively referred to herein as the "Underwriter Defendants."

## CLASS ACTION ALLEGATIONS

20.    Plaintiff brings this action as a class action pursuant to Article 9 of the New York Civil Practice Law and Rules ("CPLR") [CPLR § 901, *et seq.*], individually and on behalf of a class of persons who purchased Fannie Mae Series-S Preferred Stock pursuant and/or traceable to the Company's Offering and were harmed by defendants' actions described below (the "Class").  Excluded from the Class are the defendants, parent companies, subsidiaries or affiliates of any defendant, and members of the immediate family any individual defendant.

21.    This action is properly maintainable as a class action because:

(a)    The members of the Class are so numerous that joinder of all

members is impracticable. Fannie Mae issued at least 280 million shares of Series-S Preferred

Stock in the Offering. The precise number of Class members is unknown to plaintiff at this time

but is believed to be in the thousands.

      (b)    Plaintiff is committed to prosecuting this action and will fairly

and adequately represent and protect the interests of the other members of the Class. Plaintiff

has retained competent counsel experienced in class action litigation to further ensure such

protection and to prosecute this action vigorously.

      (c)    Plaintiff's claims are typical of the claims of the other members of

the Class because plaintiff's and all the Class members' damages arise from and were caused by

the same false and misleading representations and omissions made by or chargeable to

defendants. Plaintiff does not have any interest antagonistic to, or in conflict with, the Class.

      (d)    A class action is superior to other available methods for the fair

and efficient adjudication of this controversy since the damages suffered by individual Class

members may be relatively small, the expense and burden of individual litigation make it

virtually impossible for the Class members to seek redress for the wrongful conduct alleged.

Defendants would pour tremendous resources into the litigation of an individual suit, forcing

individual plaintiffs to expend comparable sums that would most likely consume the entire dollar

amount of their claims. Absent a class action, Class members will have no cost-effective form of

relief.

      (e)    A class action is in the best interest of judicial economy. Proof of the

wrongs committed against plaintiff will provide proof of the wrongs committed against all Class

members. The names and addresses of the Class members can be ascertained through discovery

from the books and records kept in the regular course of business by defendants or their transfer

7

agent. Notice can be provided to all Class members by a combination of published notice and

first-class mail to addresses maintained by the defendants, using techniques and a form of notice

similar to those customarily used in class actions. One court can thoroughly adjudicate all Class

members' claims with respect to the conduct complained of herein.

(f)      Common questions of law and fact exist as to all members of the

Class and predominate over any questions affecting solely individual members of the Class.

Among the questions of law and fact common to the Class are:

(i)      whether the federal securities laws and state laws were

violated by defendants alleged improper acts;

(ii)      whether the Offering Documents (which include, without

limitation, the SEC Form 8-K, dated December 4, 2007, and the related Fannie Mae Preferred

Offering Roadshow Presentation, dated December 5, 2007; the Offering Circular, dated

December 6, 2007; SEC Form 8-K, dated December 11, 2007, and the related Exhibit No. 4.1,

Certificate of Designation of Terms of Fixed-to-Floating Rate Non-Cumulative Preferred Stock,

Series-S; (collectively, the "Offering Documents"), used by defendants to sell the Series-S

Preferred Stock to the investing public omitted and/or misrepresented material facts about Fannie

Mae and its business; and

(iii)      whether the alleged improper conduct by the defendants caused

damage to plaintiff and the Class; and

(iv)      the appropriate measure of such damages.

(g)      Plaintiff knows of no difficulty that will be encountered in the

management of this litigation that would preclude its maintenance as a class action.

8

## SUBSTANTIVE ALLEGATIONS

22.    On or about December 5, 2007, Fannie Mae filed SEC Form 8-K, dated December 5, 2007, which stated that "[o]n December 5, 2007, Fannie Mae...post[ed] to its website a presentation that the company will use in conjunction with its roadshow for its planned preferred stock offering."

23.    The next day, on December 6, 2007, Fannie Mae posted an Offering Circular for the Series-S Preferred Stock to its website. The Offering Circular, incorporated by reference, and stated that "[t]he data should be read in conjunction with, among other things, the unaudited condensed consolidated financial statements and notes to financial statements contained in the Third Quarter 10-Q." The Fannie Mae Form 10-Q reported, among other things that the Company's Core capital as of September 30, 2007 was estimated to be $41,713 billion, $2.319 billion over the Office of Federal Housing Enterprise Oversight ("OFHEO"), directed minimum Core capital amount of $39,393 billion.

24    While the Offering Documents represented, among other things that $7 billion in capital raised through the Offering would provide a "Capital cushion over regulatory requirements" and "additional capital to take advantage of select business growth opportunities", the Offering Documents used to sell the Series-S Preferred Stock were materially false and misleading.

25.    The Offering Documents were materially false and misleading in that, among other things, the Offering Documents:

(a)    failed to disclose that the defendants had commenced a scheme to conceal its Core capital deficiencies from the public;

(b)     materially understated losses by delaying the recognition of material losses from impaired mortgage-related investments as its massive holdings in Alt-A and other speculative mortgage related paper;

(c)     materially understated liabilities from its mortgage guarantee obligations;

(d)     materially overstated the value of "soft assets" such as deferred tax assets and tax credits on low income partnerships; and

(e)     misrepresented the Company's true financial condition and prospects.

26.     Within weeks after completion of the Offering, Fannie Mae began to dribble out to the public the truth about its dire financial condition and prospects, sending the market prices of its equity securities, and the Company itself, into a downward spiral from which neither may recover.

27.     On February 27, 2008, Fannie Mae issued a press release to announce financial results for its fourth quarter and year ended December 31, 2007. For its fourth quarter of 2007, Fannie Mae reported a net loss of $3.6 billion. The reported loss was attributed to, among other things, a $2.0 billion increase in combined credit loss reserves in light of delinquencies and defaults and a $600 million "other than temporary" impairment loss on investments in the mortgage and liquid investment portfolios. Credit related expenses in the forth quarter were $3 billion and $5 billion for the year compared to $326 million and $783 million for fourth quarter and year ended 2006.

28.     Fannie Mae reported $45.4 billion in Core capital as of December 31, 2007, compared to reported Core capital of $42 billion as of December 31, 2006. The press release also states that Fannie Mae issued $7.8 billion in preferred stock in the fourth quarter to maintain sufficient capital levels. As of December 31, 2007, OFHEO, the Company's regulator, mandated

that Fannie Mae maintain minimum Core capital of $41.5 billion. Thus, according to Fannie

Mae's reported figures, the Company had burned through more than half of the capital it had

raised in the fourth quarter 2007 from the plaintiff and members of the Class, which left reported

Core capital at a mere $3.8 billion over the required minimum.

29.    Fannie Mae also revealed in connection with the release of its fourth quarter 2007

results that the Company expected losses from mortgage defaults and delinquencies to

substantially increase in 2008.

30.    In a March 10, 2008 article headlined "The Next Government Bailout?" Barron's

reported that yields on guaranteed mortgage securities issued by Fannie Mae rose to their highest

level over U.S. Treasuries in 22 years. Likewise, credit default swaps, measuring market

concerns over the safety of Fannie corporate debt ballooned out to 2% of the insured amount

from just 0.5% just four months ago. While Fannie CEO Daniel Mudd attributed concerns to the

toughest housing and mortgage market in a generation, in truth, much of Fannie Mae's losses

came from speculative forays into higher-yielding riskier mortgage products such as subprime,

Alt-A mortgages, often called "liar loans" because the borrowers provide little documentation of

creditworthiness, and other types of dicey mortgages that require interest only or even lower

initial payments. Fannie Mae's $314 billion in "liar loans" accounted for 31.4 percent of Fannie

Mae's 2007 credit losses.

31.    In addition to massive holdings in speculative mortgage products, Barron's found

that Fannie Mae's balance sheet was "larded with soft assets and understated liabilities."

Barron's reported that St. Louis Federal Reserve Bank president William Poole said that Fannie

Mae appeared to be insufficiently capitalized to handle the kinds of losses suffered by major U.S.

bank in the past six months.

11

32.     _Barron's_ further reported that Fannie was "inordinately easy on itself" when, in

the fourth quarter 2007, the Company wrote down its $74 billion holding of privately packaged,

non-agency subprime and Alt-A mortgage securities by a mere 6%, or $4.6 billion and then

declared that only $1.4 billion of the $4.6 billion write down constituted a permanent

impairment.  Therefore, only $1.4 billion of the write down impacted Fannie Mae's reported

income and net worth.  According to _Barron's_, nearly all major banks, including defendant

Merrill Lynch, took much larger percentage write downs of holdings of similar mortgage paper

and ran virtually all of the losses through their income statements.  Had Fannie Mae properly

written down its mortgage securities consistent with major U.S. banks, the Company would have

been in breach of its mandated capital requirements as of the fourth quarter 2007, or even earlier.

33.     On May 6, 2008, Fannie Mae issued a press release to announce financial results for

the Company's first quarter 2008, ended March 31, 2008.  The Company reported a net loss of

$2.2 billion.  The press release further stated that the Company's provision for credit losses plus

foreclosed property expenses – rose to $3.2 billion from $3.0 billion in the fourth quarter of

2007, primarily due to an increase in charge-offs.  This reflects higher defaults and average loan

loss severities, driven by national home price declines and weak economic conditions in the

Midwest.  Fannie Mae also announced plans to raise an additional $6 billion in equity through

offerings of common and preferred stock.

34.     On May 6, 2008, _The New York Times_ reported that concerns over Fannie Mae's

finances prompted fierce behind-the-scenes battles with nervous government officials.  One high

ranking member of Fannie Mae's regulator OFHEO, who requested anonymity, fearing

dismissal, said "It's not irrational to be thinking about a bailout."

12

35.     On May 12, 2008, in a follow-up to the March 10, 2008 article, <u>Barron's</u> surmised that the U.S. government might be forced to nationalize the Company in order to fulfill its implicit guarantee of Fannie Mae's huge corporate and guaranteed debt obligations. <u>Barron's</u>, "Is Fannie Mae Toast?", May 12, 2008. The May 6, 2008 earnings report did nothing to change <u>Barron's</u> gloomy view. In addition to the multi-billion dollar write downs to the Company's net worth, Fannie reported "funky" deferred tax assets had jumped from $13 billion to $17 billion in the quarter, thus, inflating the Company's previously reported earnings and net worth.

36.     On August 8, 2008, Fannie Mae issued a press release announcing that its second quarter 2008 loss was $2.3 billion or $2.54 per common share. <u>The Wall Street Journal</u> reported on August 9, 2008 that the Fannie Mae second quarter loss was nearly four times larger than the consensus estimate of outside analysts. Fannie Mae further revealed that it expected additional heavy losses going forward and that the Company may need to raise more capital beyond the $7.4 billion in proceeds from share offerings in May 2008.

37.     On August 18, 2008, in an article headlined "The Endgame Nears for Fannie and Freddie", <u>Barron's</u> reported that it "may be curtains soon for the managements and shareholders" of beleaguered housing giants Fannie Mae and Freddie Mac, and that the "balance sheets of both companies have been destroyed." <u>Barron's</u> reported that the Bush administration said Fannie Mae and Freddie Mac were being pressured by their regulator to raise more equity, but "government officials don't expect the agencies to succeed." According to <u>Barron's</u>, the "White House began to worry about Fannie and Freddie's solvency in February 2008, when both agencies reported capital shredding losses for the fourth quarter of 2007." Moreover, <u>Barron's</u> reported that after taking into account, among other things, deferred tax assets that should be

13

written down, Fannie Mae may have negative $50 billion in asset value with "little prospect" of digging itself out of the hole.

38.     According to a September 7, 2008 article published in The New York Times, on Friday, September 5, 2008, defendant Mudd and other Fannie Mae executives were ordered to appear in the offices of its new regulator, the Federal Housing Finance Agency ("FHFA"), to meet with James B. Lockhart. During that meeting, Mr. Lockhart informed the Fannie Mae executives that the FHFA was exercising its authority to place Fannie Mae in conservatorship. According to The New York Times, advisors from Morgan Stanley hired by the United States Treasury Department to scrutinize the Company's financial reporting and condition came to the conclusion that Fannie Mae had used accounting methods that delayed recognition of losses and deferred the reporting of capital shortfalls. The New York Times reported that Fannie Mae inflated its reported financial position with, among other things, deferred tax assets accumulated over the years that can be used to offset future profits. Also, Fannie Mae marked down the value of delinquent or troubled mortgages and mortgage-related securities at a rate substantially less than other companies like private mortgage insurers that have been quicker to recognize losses and have set aside much greater amounts. The New York Times further reported that as of Saturday, September 6, 2008, Fannie Mae agreed to the government takeover of the Company.

39.     On September 7, 2008, The Wall Street Journal reported that, in "the most dramatic market intervention in years," Treasury Secretary Henry Paulson pledged to provide as much as $100 billion to troubled Fannie Mae. Mr. Paulson also ousted Fannie Mae CEO Daniel Mudd who would be replaced by Herb Allison, former chairman of the investment company TIAA-CREF. The Wall Street Journal went on to report that "existing shareholders won't fare

14

so well" under the federal government rescue of Fannie Mae, which was "likely to leave a trail of billions of dollars in losses for stockholders."

40.     At the time of the filing of this complaint, Fannie Mae Series-S Preferred Stock traded in a range of approximately $3 per share, considerably less than the Offering price of $25.00 per share and the price at which Class members purchased their shares.

## COUNT I

### Violations of Section 12(a)(2) of the Securities Act
### <u>Against all Defendants</u>

41.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

42.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Class, against all defendants.

43.     Defendants, and each of them, offered, sold, solicited and/or were a substantial factor in the sale of Series-S Preferred Stock pursuant to the Offering Documents. The Offering Documents were, as set forth above, materially misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

44.     The defendants named herein were responsible for the contents and dissemination of the Offering Documents.

45.     As the issuer of the Series-S Preferred Stock, Fannie Mae is strictly liable to plaintiff and the Class for the material misstatements and omissions contained in the Offering Documents.

15

46.     None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

47.     The plaintiff was not aware of the material falsity of the statements contained in, nor omissions from, the Offering Documents at the time plaintiff and the other members of the Class purchased their Series-S Preferred Stock.

48.     By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, Section 12 of the Securities Act.

49      Plaintiff acquired shares of Fannie Mae Series-S Preferred Stock pursuant to the Offering Documents.

50.     Plaintiff and the Class have been damaged by defendants' conduct alleged herein.

51.     Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this Complaint.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this Complaint.

## COUNT II

### Against the Individual Defendants
### For Violation of Section 15 the Securities Act

52.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

53.     This Count is brought against the Individual Defendants pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of plaintiff and other members of the Class who purchased or otherwise acquired Series-S Preferred Stock pursuant or traceable to the Offering.

16

54.     Each of the Individual Defendants was a control person of the Company with respect to the Offering by virtue of each Individual Defendants' position as a senior executive and/or director of Fannie Mae.

55.     Each of the Individual Defendants, by virtue of their positions as directors and/or senior officers of Fannie Mae, controlled Fannie Mae as well as the contents of the Offering Documents at the time of the Offering. Each of the Individual Defendants was provided with or had unlimited access to copies of the Offering Documents and had the ability to either prevent their issuance or cause them to be corrected.

56.     The Individual Defendants are each liable under Section 15 of the Securities Act for Fannie Mae's primary violations of Section 12(a)(2) of the Securities Act.

57.     By virtue of the foregoing, plaintiff and other members of the Class who purchased or otherwise acquired Fannie Mae's Series-S Preferred Stock pursuant or traceable to the Offering are entitled to damages from the Individual Defendants.

## COUNT III

## Common Law Fraud Against All Defendants

58.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.     The Offering Documents were materially false and misleading when issued.

60.     Each of the defendants knew, or, but for recklessness, should have known that the Offering Documents were materially false and misleading when issued.

61.     The defendants intended that the plaintiff and the members of the Class rely on the Offering Documents.

62.     The plaintiff and members of the Class reasonably relied on the Offering Documents.

63.     Plaintiff and the members of the Class have been damaged by defendants' fraudulent conduct.

## COUNT IV

### Negligent Misrepresentation Against All Defendants

64.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

65.     Defendants acted negligently and carelessly in disseminating and using the Offering Documents to sell the Series-S Preferred Stock.

66.     Defendants knew, or had reason to know, that the plaintiff and other members of the Class would rely on the Offering Documents in making a decision whether to buy the Series-S Preferred Stock.

67.     Plaintiff and the members of the Class were damaged due to defendants' improper conduct.

68.     Defendants directed the materially false Offering Documents to plaintiff and other members of the Class knowing that plaintiff and the members of the Class relied on them to provide full and truthful disclosures concerning the Offering.

### PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on her own behalf and on behalf of the Class, prays for judgment as follows:

A.     declaring this action to be a plaintiff class action properly maintained pursuant to Article 9 of the CLPR, certifying the Class and certifying counsel as Class Counsel;

18

B.    awarding plaintiff and the other members of the Class rescission for their purchases of Series-S Preferred Stock;

C.    awarding plaintiff and the other members of the Class damages against defendants, jointly and severally, together with interest thereon;

D.    awarding plaintiff and the other members of the Class their costs and expenses of this litigation, including attorneys' fees, accountants' fees and experts' fees, and other costs and disbursements and;

E.    awarding plaintiff and the other members of the Class such other and further relief as may be or as the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

Dated: September 11, 2008

Respectfully submitted,

**STULL, STULL & BRODY**

By: 
Jules Brody
Aaron Brody
6 East 45th Street
New York, New York 10017
Telephone: (212) 687-7230
Facsimile: (212) 490-2022

**KOVEN & KRAUSZ**
Mordchai Krausz
350 5th Avenue
New York, New York 10118
Telephone: (212) 736-7432
Facsimile: (212) 967-2755

**Attorneys for Plaintiff**